# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| **POLLY ROARK,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:16CV00040 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **UNIVERSAL FIBERS, INC.** | ) | By: James P. Jones |
| **ASSOCIATES SAVINGS PLAN,** | ) | United States District Judge |
| | ) | |
| Defendant. | ) | |

*R. Lucas Hobbs, Elliott Lawson & Minor, P.C., Bristol, Virginia, for Plaintiff; W. Bradford Stallard, Penn, Stuart & Eskridge, Abingdon, Virginia, for Defendant.*

In this case governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461 ("ERISA"), I previously denied the defendant's Motion for Judgment on the Pleadings and granted the plaintiff's Motion for Judgment on the Pleadings. Op. and Order, Jan. 6, 2017, at 10, ECF No. 22; Op. and Order, Feb. 14, 2017, at 3, ECF No. 31. I held that defendant Universal Fibers, Inc. Associates Savings Plan ("Plan") should have paid the death benefit of the decedent's retirement account to his widow rather than to his parents.

The widow, plaintiff Polly Roark, has now moved for an award of attorneys' fees and prejudgment interest. With their briefs in support of and in opposition to Polly's motion, the parties submitted conflicting affidavits on the issue of the

Plan's good faith and the extent to which Polly's actions may have contributed to a delay in payment. I held an evidentiary hearing to determine whether Polly is entitled to attorneys' fees, whether she is entitled to prejudgment interest, and the appropriate rate of prejudgment interest. The Plan does not contest the amount of attorneys' fees and costs requested.

I.

Based on the evidence presented at the hearing, as well as uncontested matters of record, I make the following findings of fact.

After her husband Steven's death, Polly received a letter from the Social Security Administration notifying her of the existence of Steven's Plan retirement account and that she may be entitled to its proceeds. At the time, Polly did not intend to withdraw the funds. She preferred to keep them invested in the account and allow them to continue to grow until she needed them.

Following Steven's death, Polly and Robert Roark, Steven's father, had a dispute about the ownership of a garage that was located between their houses. Polly hired attorney Ralph Dillow to represent her in that dispute. In the course of that representation, Robert mentioned to Dillow that he had received the proceeds from Steven's Plan account. Polly first learned from Dillow that the funds from the retirement account had been distributed.

Polly contacted Universal Fibers, Inc. ("Universal Fibers"), the successor to Steven's former employer, and spoke to Judy Shumate, who was temporarily acting as human resources manager while that position was vacant. Shumate confirmed that the money from Steven's account had been distributed to Robert and Joan Roark. Shumate told Polly that the Plan had not been aware of Steven's marriage to Polly and that the funds should have been distributed to Polly. Polly expected that Shumate would work on the issue and that Polly would eventually receive the account proceeds. After a second phone conversation, Polly received a letter from Shumate dated June 14, 2013, that stated:

> To confirm my phone call to you today, as Steven's surviving spouse, we need to inform you of the rights given you by a federal law (ERISA). The Employee Retirement Income Security Act (ERISA) governs 401(k) employee savings plans. ERISA rules and guidelines require that a surviving spouse has the primary right to any assets in the account, unless the spouse has signed a waiver consenting in writing to the naming of anyone other than the spouse as primary beneficiary. No such waiver was produced. Accordingly, the 401(k) funds actually belong to you, Steven's spouse.
>
> The company was not aware that Steven had married. He was single when he resigned from Universal Fibers and had not updated his beneficiary form. Now that we have knowledge of a surviving spouse, we are taking action to correct the inappropriate distribution. Therefore, Universal Fibers is contacting his designated beneficiaries, Robert L. and Joan C. Roark, to alert them to this fact and asking that the death benefit distribution received by them be returned to the American Funds 401(k) account. The amount distributed was $54,257.90.
>
> Once the funds are returned, we will so notify you and advise you of your options regarding a rollover or distribution.

Pl.'s Ex. 1, ECF No. 42-1.

Several weeks after she received the letter from Shumate, Polly asked Dillow to work on the matter. Dillow obtained from the Plan copies of several emails related to the account. On June 5, 2013, Shumate had emailed Monica Stolte, a retirement plan coordinator at American Funds,[1] about the situation. On June 10, 2015, Stolte replied that "the spouse is the beneficiary if a participant is married at the time of death, regardless of any previous designation." Pl.'s Ex. 4 at 2, ECF No. 42-4. Stolte instructed Shumate,

> The assets should be requested back from the parents and re-deposited into the account. The spouse can then claim the assets. If the assets are not returned to the account/plan, Universal Fibers should restore the assets (amount at the time of the death distribution) to the participant account, and allow the spouse beneficiary to claim the assets.

*Id.*

The same day, in another email, Shumate asked Stolte when the spouse should be notified of the erroneous distribution. Stolte responded, "The spouse should be notified as soon as possible. If the assets aren't returned she may want to pursue legal action." Pl.'s Ex. 7 at 1-2, ECF No. 42-7. In an email sent to Shumate on June 11, 2013, Stolte stated that "the marriage negates the previous beneficiary designation of the parents." Pl.'s Ex. 4 at 1, ECF No. 42-4.

---

[1] The Plan funds were invested with American Funds, a large family of mutual funds that offers more than 360,000 retirement plans. American Funds, https://www.americanfunds.com/employer# (last visited May 8, 2017).

On June 14, 2013, the same day she sent a letter to Polly, Shumate sent a letter to Joan Roark explaining the mistake in payment and stating that it was "necessary and legally required" for Joan and Robert to "return to American Funds the death benefit sent to you . . . for replacement into Steven's 401(k) account." Pl.'s Ex. 5, ECF No. 42-5. The letter explained that the taxes withheld from the distribution would likewise be returned to the account, and the 1099 form to be delivered to Joan and Robert would be cancelled. An identical letter was sent to Robert. Robert and Joan never returned the assets to American Funds.

Timothy Lawson became the human resources manager at Universal Fibers in September 2013, approximately three months after Shumate first acknowledged that the funds had not been distributed to the correct legal beneficiary. Prior to joining Universal Fibers, Lawson had worked in the human resources field in the military, but he had no experience with ERISA plans. Shumate trained Lawson during the first two weeks of his employment with Universal Fibers.

Lawson did not agree with Shumate that Polly was entitled to the death benefit. He believed that the money had been properly distributed to the designated beneficiaries, and he apparently convinced attorney Dillow of this. Dillow incorrectly conceded that Polly had no viable claim against the Plan and that any claim would be against Robert. Dillow told Lawson that Polly simply wanted assurance that the money would be designated for her children. Dillow

asked Lawson to meet with the involved parties to provide information and facilitate an agreement between Polly and Robert regarding how the funds would be invested.

In January 2015, Polly and Dillow met with Lawson, who provided documentation that the funds had been transferred to bank accounts owned by Robert and Joan. Lawson told Polly that based on his interpretation of the plan documents, the funds had been properly paid to Robert and Joan. Robert said the funds were being held for the benefit of Polly and Steven's children. At some point, Polly learned that the funds had been used to purchase a Woodmen of the World cash value whole life insurance policy in Robert's name. The children were beneficiaries of the life insurance policy and would receive the policy proceeds either upon Robert's death or upon turning 21, as long as Robert did not change the beneficiaries. Polly was never provided a copy of the life insurance policy.

Lawson believed no agreement with Polly was necessary because he thought the funds had been correctly paid to Robert and Joan. Lawson contacted Robert and Dillow and attempted to arrange a meeting at which Polly could view the life insurance policy to be satisfied that her children were named as its beneficiaries, but no such meeting ever took place. The January 2015 meeting was the only

occasion on which Lawson directly communicated with Polly; all of his further communications were with Dillow.[2]

Following the January 2015 meeting, Jackie Cox of Woodmen of the World, who was working on behalf of Robert and Joan, called Polly and told her that he was going to put the money into accounts for the benefit of Polly's children. Polly told Cox to contact Dillow, who was handling the matter for Polly. Dillow later told Polly that Robert had proposed signing the policy over to Polly in exchange for Polly giving Robert ownership of the disputed garage, but Polly did not agree to that offer. Polly grew frustrated with the situation and decided she no longer wanted the funds to be returned to the Plan account and to remain there, as she had once contemplated. Instead, she wanted the proceeds paid to her so that she would no longer have to deal with Universal Fibers or Woodmen of the World. She communicated this preference to Dillow, but because she had never reached any agreement with Universal Fibers, the Plan, or Robert, she did not notify them that she had changed her mind.

On December 28, 2015, Polly sent an email to Lawson. In the email, she asked for information and stated that her lawyer had been working on the case for nearly two years, but the issue had not been resolved. She asked Lawson to contact her about the death benefit. Lawson did not respond to Polly's email, but

---

[2] Dillow passed away in October 2016, a few days before the Complaint in this case was filed.

he communicated with Dillow, who continued to state that Polly agreed to how the money was being managed and simply wished to see the life insurance policy to ensure that her children were named as beneficiaries. I find that Polly acquiesced in Dillow's erroneous advice and only accepted that the funds were placed in the life insurance policy because she believed she was not legally entitled to the death benefit.

Alhough Lawson now requires a death certificate in order to process Plan death benefit claims, the Plan does not have a policy requiring a claimant to produce a death certificate. However, Universal Fibers had received a copy of Steven's death certificate as part of the distribution request submitted by Cox on behalf of Robert and Joan. The death certificate clearly identified Polly as Steven's spouse.

Polly does not currently work outside the home. She receives social security income. She previously worked as a retail department manager, a veterinary technician, and for a company that distributed prescriptions to nursing homes. She has a high school diploma and has taken some college courses, but she does not have a college degree. Her children are now 15 and 11 years old. After Steven's death, Polly and her children did not have health insurance coverage for several years and had to pay for various health expenses. The death benefit from Steven's other retirement account, administered by the employer for whom he had worked

at the time of his death, has been placed into investment accounts in the children's names. Polly also used some funds from that account to purchase a van for the family. Polly expects to use some of the money from the Plan account to pay for her children's college tuition. The money would also be used to pay for things the children need now, like clothing.

Universal Fibers, the sponsor of the Plan, is a large international company with more than 1,000 employees and production facilities on three continents. It has the ability to contribute additional funds to the Plan to cover any attorneys' fees or prejudgment interest I award. In addition, the Plan can use funds from forfeited accounts to pay any award.

## II.

It is within the court's discretion to award attorneys' fees and costs to a party who has achieved some degree of success in ERISA litigation. 29 U.S.C. § 1132(g)(1); *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 245 (2010). There is no presumption in favor of attorneys' fees for prevailing parties. *Carolina Care Plan Inc. v. McKenzie*, 467 F.3d 383, 390 (4th Cir. 2006), *overruled on other grounds by Carden v. Aetna Life Ins. Co.*, 559 F.3d 256 (4th Cir. 2009). To determine whether a party should receive attorneys' fees, this court must measure the following factors:

(1) degree of opposing parties' culpability or bad faith;

(2) ability of opposing parties to satisfy an award of attorneys' fees;

(3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances;

(4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and

(5) the relative merits of the parties' positions.

*Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1029 (4th Cir. 1993). None of these factors are dispositive. *Id.* They simply act as general guidelines for the fee analysis. *Id.* Other considerations may also be relevant depending on the particular case. *Id.*

Turning to the first factor, even if it did not rise to the level of bad faith, I find that the Plan's behavior was culpable. *See McPherson v. Emps.' Pension Plan of Am. Re-Ins. Co.,* 33 F.3d 253, 258 (3d Cir. 1994) ("[I]t will further the objectives of ERISA if fee awards are employed to deter behavior that falls short of bad faith conduct."). Culpable conduct is "blameworthy" or "involving the breach of a duty," *Black's Law Dictionary* (10th ed. 2014), and "normally involves something more than simple negligence," *Werner v. Upjohn Co.,* 628 F.2d 848, 856 (4th Cir. 1980).

The Plan received the death benefit claim submitted on behalf of Robert and Joan on May 6, 2013, along with the death certificate. Apparently without

reviewing the death certificate or undertaking any other investigation of Steven's marital status, the Plan disbursed the death benefit to Robert and Joan the very next day.  The Plan learned no later than June 10, 2013, that Polly was entitled to the death benefit.  The Plan, through Shumate, assured Polly that it was taking steps to correct the erroneous distribution.  Aside from sending letters to Robert and Joan requesting return of the funds, however, it does not appear that the Plan ever took any action to right the wrong to Polly.  Stolte specifically told Shumate that the Plan needed to restore the funds to Steven's account even if Robert and Joan did not return the funds.  The Plan did not comply with this instruction.

By the time Lawson took over as human resources manager, approximately three months had already passed since Shumate's first interactions with Polly.  The Plan has offered no explanation for why the funds were not restored to the account during those three months.  Lawson then joined Universal Fibers and, based on his own reading of the Summary Plan Description ("SPD"), despite having no ERISA experience and without consulting an attorney, he decided that both Shumate and Stolte had reached the wrong conclusion.  He orally communicated his stance to Dillow, and Dillow, who was not an ERISA expert, agreed with Lawson's misinterpretation of the plan documents and the law.  To the extent Polly acquiesced to Robert's use of the funds to purchase life insurance for the benefit of

Polly's children, she did so only because both the Plan and her own attorney misinformed her about what the plan documents and the law required.

Although the Plan encouraged Polly to reach an agreed resolution with Robert, the Plan took the position that it was not required to take any action to ensure that Polly received the funds to which she was entitled. Until I ruled in Polly's favor on the merits, the Plan continued to urge mediation, yet it simultaneously contended that it owed Polly nothing and any dispute was between Polly and Robert. Polly had no incentive to agree to mediation or to otherwise compromise her claim because the Plan had unequivocally communicated to her in June 2013 that she was entitled to the funds. The Plan is clearly the culpable party here; had the Plan properly restored the funds to the account in the summer of 2013 in accordance with Stolte's instruction, this litigation would have been unnecessary. The first *Quesinberry* factor favors an award of attorneys' fees.

The second factor I must consider is the Plan's ability to pay an award of attorneys' fees. The Plan is administered and sponsored by Universal Fibers, a large corporation with more than 1,000 employees. The Plan has indicated that funds from former employees' forfeited accounts could be used to satisfy any award in this case, although the parties did not submit any evidence of the amount of such forfeited funds available. If the forfeited funds are insufficient to pay the judgment in this case, I see no reason why Universal Fibers should not be expected

to contribute funds to the Plan to cover any shortfall. Although Universal Fibers itself is not the defendant in this case, its employees caused the improper payment that led to this litigation. The second factor favors an award of attorneys' fees and costs.

The third factor asks whether an award of attorneys' fees would deter other persons acting under similar circumstances. I find that it would. The possibility of an attorneys' fees award will encourage other ERISA plan fiduciaries to take action to correct their mistakes promptly and to seek appropriate legal advice in making important ERISA decisions, so that other beneficiaries will not be required to wait nearly four years to receive the funds to which they are entitled. Surviving spouses often rely on funds from ERISA accounts to pay for their most basic needs after losing a spouse's income, and providing prompt access to these funds is essential to further the purposes of ERISA. The third factor supports an award of attorneys' fees and costs.

The fourth factor is neutral. While my ruling on the merits of this case will likely benefit other Plan participants and their spouses, this is not a class action case, and Polly did not file suit with the intention of helping others. Her goal was to obtain the money to which she was entitled. I do not believe this case sought to resolve a novel legal issue. The importance of ERISA's spousal protections has long been clear, as shown by the case law cited in my earlier opinion. *See* Op. and

Order, Jan. 6, 2017, at 8-10, ECF No. 22. Likewise, the applicable statutory, regulatory, and SPD provisions plainly indicate that unless the surviving spouse executed a valid consent or cannot not be located, the surviving spouse is entitled to the proceeds of a Plan account. *See* Op. and Order, Feb. 14, 2017, at 2, ECF No. 31.

As to the fifth *Quesinberry* factor, the Plan continues to argue that the SPD contains conflicting provisions about who was entitled to the death benefit in this case and that *Kennedy v. Plan Administrator for DuPont Savings and Investment Plan*, 555 U.S. 285 (2009), suggests that the Plan properly paid the death benefit to the named beneficiaries. Lawson's testimony at the evidentiary hearing demonstrated that he still believes, even after my ruling on the matter, that the SPD justified paying the death benefit to Robert and Joan rather than to Polly.

The Supreme Court's ruling in *Kennedy* has no bearing on this case. There was no surviving spouse in the *Kennedy* case. Instead, *Kennedy* involved an ex-spouse, a waiver of benefits, and ERISA's provisions governing antialienation and qualified domestic relations orders — provisions that are not at issue in this case. Polly is not Steven's ex-wife; she is his widow. She did not execute any waiver. The Court stated in *Kennedy*, "Depending on the circumstances, a surviving spouse has a right to a survivor's annuity or to a lump-sum payment on the death of the participant, unless the spouse has waived the right and the participant has

eliminated the survivor annuity benefit or designated a different beneficiary." *Id.* at 293. That is exactly what I ruled in this case. The Plan's continued reliance on *Kennedy* is misplaced.

The plan documents at issue here are not ambiguous. Throughout this litigation, the Plan has pointed to the following statement in the SPD to support its position: "If you terminate employment with us and subsequently die, your beneficiary will be entitled to the vested percentage of your remaining account balance at the time of your death." Compl. Ex. B at 13, ECF No. 1-3. Lawson and the Plan interpret this sentence as though it said "your *named, designated* beneficiary," but the sentence does not say that. It merely refers to "your beneficiary," and as the SPD explains elsewhere, "[i]f you are married at the time of your death, your spouse will be the beneficiary." *Id.* at 12-13. The Plan's attempt to draw a distinction between its treatment of surviving spouses of current employees and surviving spouses of former employees is illogical. A key goal of ERISA is to provide financial protection to surviving spouses, see Op. and Order, Jan. 6, 2017, at 8-10, ECF No. 22, and it makes no difference whether the decedent was working for the employer at the time of his death or had previously resigned.

The Plan's position is not meritorious. I have found for Polly on the merits, and I do not consider this case to present a close question. The final *Quesinberry* factor thus supports awarding attorneys' fees and costs to Polly.

Based on my analysis of the five factors articulated in *Quesinberry*, I find that an award of attorneys' fees and costs is warranted in this case. The Plan does not contest the requested amount of fees and costs reflected on counsel's billing records submitted. The fee requested reflects a reasonable amount of time expended at a customary hourly rate, taking into account the amount in controversy and the results obtained, as well as the skill and experience of the attorneys involved. *See Barber v. Kimbrell's Inc.*, 577 F.2d 216, 226 n.28 (4th Cir. 1978) (adopting factors set forth in *Johnson v. Ga. Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974)). Accordingly, I will order the Plan to pay the amount of plaintiff's attorneys' fees and costs incurred as of April 18, 2017, plus an additional three hours in attorneys' fees at the rate of $220 per hour for work performed on the day of the evidentiary hearing. The total amount of attorneys' fees and costs to be paid by the Plan to the plaintiff is $9,659.65, which amount will be added to the judgment to be entered in the case.

### III.

"Federal law controls the issuance of prejudgment interest awarded on federal claims." *Fox v. Fox*, 167 F.3d 880, 884 (4th Cir. 1999). "The essential rationale for awarding prejudgment interest is to ensure that an injured party is fully compensated for [her] loss." *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 195 (1995). Polly Roark "is entitled to an award of

prejudgment interest because of the general rule that interest follows principal." *Mary Helen Coal Corp. v. Hudson*, 235 F.3d 207, 208 (4th Cir. 2000). Because ERISA does not provide a statutory prejudgment interest rate, the determination of the appropriate rate is left to the court's discretion. *Fox*, 167 F.3d at 884.

While it is true that the incorrect advice Polly received from Dillow may have contributed to the delay in her receipt of the death benefit, the proximate cause of the delay was the Plan's disbursement of the funds to the wrong parties and its failure to promptly restore the funds to the account. Had the Plan taken action to correct its mistake as it promised to do in the summer of 2013, Polly would not have had to involve Dillow in the dispute at all. Therefore, I find that this is an appropriate case for an award of prejudgment interest.

Polly requests simple prejudgment interest at the Virginia statutory rate of six percent. *See* Va. Code Ann. § 6.2-302; *see also Quesinberry*, 987 F.2d at 1031 (applying Virginia statutory interest rate in ERISA case); *McIntyre v. Aetna Life Ins. Co.*, 581 F. Supp. 2d 749, 762 (W.D. Va. 2008) (same). I find that rate to be appropriate in this case and will order prejudgment interest on the death benefit amount of $54,257.90 at the rate of six percent per year from May 7, 2013. The amount of total prejudgment interest to be paid by the Plan to the plaintiff is $13,021.90 ($3,255.47 per year for four years), which will be added to the

judgment. Postjudgment interest will be at the federal interest rate, 28 U.S.C. § 1961. *See Quesinberry,* 987 F.2d. at 1031.

IV.

For the foregoing reasons, it is hereby **ORDERED** that the Motion and Memorandum for Award of Attorneys' Fees and Prejudgment Interest (ECF No. 33) is GRANTED. The court having now determined all matters at issue in this case, a separate final judgment will be entered forthwith.

ENTER: May 9, 2017

/s/ James P. Jones
United States District Judge